## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

MONTAGO SUGGS (R16522),

    Petitioner,

    v.

ANTHONY WILLS, Warden,

    Respondent.

Case No. 1:21-cv-01474

Judge Martha M. Pacold

## MEMORANDUM OPINION AND ORDER

Petitioner Montago Suggs, in custody at Menard Correctional Center, filed this pro se petition for habeas corpus, [1], under 28 U.S.C. § 2254, challenging his state-court convictions for murder, attempted murder, and attempted robbery. For the reasons explained below, the petition is denied, and the court declines to issue a certificate of appealability. Enter final judgment. Civil case terminated.

## BACKGROUND

On September 27, 2013, a jury convicted petitioner Montago Suggs of first-degree murder in connection with the death of Melinda Morrell at a Check 'n Go loan facility in Waukegan, Illinois. [20-1] ¶¶ 1, 8–11, 46.[1] Later, in a stipulated bench trial, Suggs was convicted of attempted murder and attempted armed robbery with a firearm in connection with a separate incident that occurred a few days later at the Ma & Pa Convenience Store in Beach Park, Illinois. *Id.* ¶¶ 1, 20–21, 49.

The court draws the following facts from the state appellate decisions in Suggs's direct appeal and state post-conviction proceedings, along with (where necessary) other portions of the state-court record. *See Hartsfield v. Dorethy*, 949 F.3d 307, 309 n.1 (7th Cir. 2020).

## I. Crimes and Investigation

### A. Check 'N Go Murder

In early May 2007, Suggs—then 23 years old—received loans from a PayDay Loan in Kenosha, Wisconsin, and a Check 'n Go in Waukegan, Illinois. [20-1] ¶ 3.

---

[1] Bracketed numbers refer to docket entries and are followed by page and / or paragraph number citations. Page numbers refer to the CM/ECF page number.

Suggs's Check 'n Go loans were processed by Melinda Morrell, a Check 'n Go employee. *Id.*

On May 21, Suggs returned to the Check 'n Go facility, where Morrell was working. *Id.* ¶ 9. He pulled a gun, told Morrell that the money was not worth her life, and emptied the drawers of about $2,000 in cash. *Id.* ¶¶ 8, 10. Suggs then asked Morrell where the facility's surveillance recordings were kept, and Morrell took him to a back room, where a television displayed live surveillance footage. *Id.* ¶ 10. The room also contained a VCR and surveillance tapes labeled by day of the week. *Id.*

Suggs ordered Morrell to lie face down on the ground and shot her in the back of the head. *Id.* ¶ 11. In a later statement to the police, he claimed his gun discharged accidentally as he knelt down. *Id.* He then removed that day's surveillance tape from the VCR and fled. *Id.* An autopsy later showed that Morrell had been killed by a single gunshot to the back of her head. *Id.* ¶ 16.

A few hours later, a customer entered the Check 'n Go facility and discovered Morrell's body, face down with a pool of blood around her head. *Id.* ¶ 14. The customer ran next door and asked for someone to call 911. *Id.* At the scene, police recovered an expended shell casing near Morrell's hip and a spent bullet on the shelf of the VCR stand. *Id.* ¶ 16. They also discovered that day's security tape was missing, and that the tape labeled "Thursday" was jammed into the VCR in its place. *Id.*

That evening, Suggs returned to the PayDay Loan in Kenosha and paid off his loan in cash. *Id.* ¶ 18. The next day, he retrieved his green Lincoln Town Car from the impound lot where it had been towed after he was arrested for driving with a suspended license. *Id.* ¶¶ 5, 19. He paid in cash and signed the receipt "Montago Suggs." *Id.* ¶ 19.

## B. Ma & Pa Robbery

A few days later, on May 26, Suggs went to the Ma & Pa Convenience Store in Beach Park, Illinois. *Id.* ¶ 20. The only other person in the store was employee Francisco Garcia. *Id.* After asking if the manager was present, Suggs pulled a gun and told Garcia that the money was not worth his life. *Id.* Garcia opened the register, and Suggs ordered him to lie face down on the floor and not move. *Id.* A customer then entered the store, and Suggs ordered him to likewise get on the floor. *Id.* Suggs returned to where Garcia was lying and pulled the gun's trigger, but it did not fire. *Id.* When the gun clicked, Garcia jumped up and triggered the silent alarm as Suggs fled the store. *Id.* He observed Suggs drive off in a green Lincoln Town Car. *Id.* The customer was able to read the license plate, which Garcia wrote down and gave to police. *Id.*

As Suggs fled the store, he slipped on wet pavement and dropped the gun, which police found on the sidewalk outside the store. *Id.* ¶ 21. A firearms expert later testified that the gun found at the Ma & Pa store was the same one used to fire the

bullet and shell casing found at the Check 'n Go facility. *Id.* The ammunition in the gun's magazine was of the same brand as the shell casing recovered from the Check 'n Go facility. *Id.*

### C.     Suggs's Arrest and Interrogations

Soon after the Ma & Pa incident, police spotted Suggs's car, and Suggs led them on a high-speed chase north into Wisconsin, where he drove off the road into a wooded area and fled on foot. *Id.* Police eventually apprehended Suggs, who remarked that he would have shot himself if he had a gun. *Id.* Police brought Garcia to the wooded area, where he identified Suggs as the man who attempted to rob the Ma & Pa store. *Id.* ¶ 23. Suggs was then taken into custody in Kenosha. *Id.*

Between May 26 and 30, several officers from the Lake County Police Department interviewed Suggs regarding both the Check 'n Go and Ma & Pa incidents. *Id.* ¶¶ 24–40. Suggs remained in the custody of the Kenosha police during this time because there was a Wisconsin probation hold on him and, because of Memorial Day, he could not appear before a Wisconsin judge until Tuesday, May 29, 2007. *Id.* ¶ 27.

On May 27, Suggs was charged with attempted robbery for the Ma & Pa incident. *Id.* ¶ 28. That afternoon, after being advised of his *Miranda* rights, he signed a statement admitting to the Ma & Pa offenses. *Id.* ¶¶ 29–31; *see* [20-20] at 121–22. The interview then shifted focus to the Check 'n Go murder. [20-1] ¶ 32. About 60 or 70 minutes later, Suggs stated that he wished to speak with an attorney and told the officers to return him to jail so they could spend their time looking for the actual perpetrator. *Id.* ¶ 33. Some discussion continued after Suggs asked to speak to a lawyer, but it did not involve anything substantive related to the Check 'n Go murder; instead, it focused on Suggs's questions about what would happen to him next. *Id.* The officers then terminated the interview. *Id.*

On May 29, police took samples of Suggs's DNA. *Id.* ¶ 35. That evening, Suggs asked to speak with Detective Schletz, one of the officers who had previously interviewed him. *Id.* Schletz reminded Suggs that he had previously asked to speak to an attorney, but Suggs insisted that he wanted to resume the conversation. *Id.* ¶ 36. Schletz readministered Suggs's *Miranda* warnings, and the interview resumed. *Id.* It continued off and on throughout the next day, and at some point Schletz was informed that the bullet recovered from Check 'n Go matched the gun Suggs had admitted using at the Ma & Pa store. *Id.* ¶¶ 36–40. Schletz subsequently confronted Suggs with this information. *Id.* ¶ 38.

The evening of May 30, Suggs made his first incriminating statement about the Check 'n Go murder and began to fill in the details of the shooting. *Id.* ¶ 40. He eventually signed a confession. *Id.*; *see* [20-20] at 145–46.

## II.    Trial Court Proceedings

Before trial, Suggs moved to suppress his confession to the Check 'n Go murder, arguing that his extradition to Illinois was unnecessarily delayed. [20-21] at 55–58. After a hearing, the trial court denied the motion, finding in addition that Suggs reinitiated conversations with police after invoking his right to counsel and that his statement was voluntary. *Id.* at 219–33. Later on, however, the motion to suppress was reopened after a retired police detective from the Kenosha Sheriff's Department came forward with an allegation that Schletz spoke to Suggs alone, without a recording or other observer. [20-1] ¶ 45. After considering the retired detective's testimony, the trial court again denied the motion to suppress. *Id.* It found the retired detective's testimony not credible, in part because he had waited five and a half years to come forward. [20-15] at 954–55.

A jury convicted Suggs of the Check 'n Go murder. [20-1] ¶ 46. At a stipulated bench trial on the Ma & Pa charges, the trial court found Suggs guilty of attempted murder and attempted armed robbery with a firearm. *Id.* ¶ 49. At a combined sentencing hearing, the trial court sentenced Suggs to 80 years of imprisonment for the murder conviction (55 years for murder plus 25 years for a firearm enhancement), 30 years for attempted armed robbery, and 28 years for attempted murder. [20-12] ¶ 19. The trial court directed that the sentence for the murder conviction was to run consecutively to the sentences for attempted armed robbery and attempted murder, which were to run concurrently with each other, meaning that Suggs would serve a total of 110 years. *Id.* The trial court also assessed various fines and costs in the Ma & Pa case, including a public-defender fee. *Id.* ¶ 50.

## III.    Direct Appeal

The Check 'n Go and Ma & Pa cases were consolidated for direct appeal. [20-1]. Suggs argued (1) that the trial court erred in denying his motion to suppress despite his being held for 98 hours without a probable cause determination, in violation of the Fourth Amendment; and (2) the trial court should not have imposed the public-defender fee. [20-2] at 29–51. The Illinois Appellate Court vacated the public-defender fee. [20-1] ¶ 96. However, it rejected Suggs's Fourth Amendment claim because Suggs had not properly preserved it for appellate review. *Id.* ¶¶ 59–60. Thus, it affirmed the convictions. *Id.* ¶¶ 96, 98.

Suggs then filed a pro se petition for rehearing. [20-5]. The petition raised several new arguments, including (1) the evidence was insufficient on all charges; (2) the motion to suppress should have been granted because it was obtained after he invoked his rights to counsel and to remain silent; (3) the motion to suppress should have been granted because the confession was not videorecorded, as required by Illinois statute, 725 ILCS 5/103-2.1; (4) evidence concerning the Ma & Pa case should not have been admitted in the Check 'n Go case; and (5) the prosecutor made improper

remarks during closing argument. [20-5]. The Illinois Appellate Court denied the petition. [20-6].

Next, Suggs filed a pro se petition for leave to appeal (PLA) to the Illinois Supreme Court. [20-7]. He asserted the same claims as in his petition for rehearing, except that he did not raise the claim concerning the prosecutor's closing argument. *See id.* The Illinois Supreme Court denied the PLA. [20-8].

## IV. Post-Conviction Proceedings

Suggs then sought post-conviction relief under the Illinois Post-Conviction Hearing Act, 725 ILCS 5/122-1. His pro se petition included the case numbers for both the Check 'n Go case and the Ma & Pa case, and thus it was filed on both dockets. [20-21] at 547–89; [20-23] at 273–315.

As the post-conviction court explained, Suggs's petition "allege[d] dozens of claims" in a "pell-mell" fashion that was difficult to comprehend. [20-21] at 682. However, the post-conviction court identified nine claims in the petition: (1) ineffective assistance of counsel for failing to call certain witnesses; (2) evidence concerning the Ma & Pa case should not have been admitted in the Check 'n Go case; (3) the motion to suppress should have been granted because Suggs's confession was obtained after Suggs invoked his rights to counsel and to remain silent; (4) the motion to suppress should have been granted because Suggs's confession was obtained after Suggs was held for 98 hours without a probable cause determination, in violation of the Fourth Amendment; (5) the motion to suppress should have been granted because the confession was not videorecorded; (6) the evidence was insufficient on the attempted murder charge; (7) the evidence was insufficient on the murder charge; (8) the prosecutor made improper remarks during closing argument; (9) Suggs's combined 110-year sentence violated the Eighth Amendment; (10) Suggs's confession was coerced; and (11) actual innocence. *Id.* at 684–701. Finding the claims to be "patently without merit," the post-conviction court denied relief. *Id.* at 701.

Now represented by counsel, Suggs appealed, raising only his Eighth Amendment claim. [20-9]. He argued that the 110-year combined sentence violated both the Eighth Amendment and Article I, Section 11 of the Illinois Constitution because it was imposed without consideration of his youth and rehabilitative potential. *Id.* at 13–32. The state appellate court rejected these arguments and affirmed the dismissal of the post-conviction petition. [20-12] ¶ 44. Suggs then filed a post-conviction PLA raising the same argument, [20-13], which the Illinois Supreme Court denied, [20-14].

## DISCUSSION

Suggs now brings this federal habeas petition, [1], under 28 U.S.C. § 2254. He challenges his convictions in both the Check 'n Go case and the Ma & Pa case. He raises eleven claims: (1) ineffective assistance of counsel for failing to call certain

witnesses; (2) evidence concerning the Ma & Pa case should not have been admitted in the Check 'n Go case; (3) his confession was coerced; (4) the evidence was insufficient on the attempted murder charge; (5) the evidence was insufficient on the murder charge; (6) his motion to suppress should have been granted because his confession was obtained after he was held for 98 hours without a probable cause determination, in violation of the Fourth Amendment; (7) his combined 110-year sentence violated the Eighth Amendment; (8) his motion to suppress should have been granted because his confession was obtained after he invoked his rights to counsel and to remain silent; (9) his motion to suppress should have been granted because the confession was not videorecorded; (10) he is actually innocent; and (11) the prosecutor made improper remarks during closing argument. [1] at 9–13.[2]

## I.    Claim 9 is Not Cognizable on Federal Habeas Review

In Claim 9, Suggs argues that the trial court should have granted his motion to suppress because portions of his interrogation for the Check 'n Go murder were not video recorded. *See id.* at 12. This appears to be a reference to the claim Suggs raised in state court, arguing that not videorecording his confession violated an Illinois statute. *See* 725 ILCS 5/103-2.1. However, a court may grant a writ of habeas corpus "only on the ground that [the petitioner] is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). "[A] state prisoner [can] never bring a pure statutory-error claim in federal habeas, because 'federal habeas corpus relief does not lie for errors of state law.'" *Jones v. Hendrix*, 599 U.S. 465, 490 (2023) (quoting *Estelle v. McGuire*, 502 U.S. 62, 67 (1991)). Thus, Claim 9 is not cognizable on federal habeas.[3]

It is also not clear that Claims 6 or 10 are cognizable on federal habeas review. Claim 6 is a Fourth Amendment claim under *Gerstein v. Pugh*, 420 U.S. 103 (1975), and *County of Riverside v. McLaughlin*, 500 U.S. 44 (1991). But Fourth Amendment exclusionary rule claims are generally not cognizable on federal habeas corpus. *See Stone v. Powell*, 428 U.S. 465, 489 (1976). Claim 10 is an "actual innocence" claim, and the Seventh Circuit has acknowledged that it is an "open question whether petitioners can obtain habeas relief under § 2254 based upon standalone claims of actual innocence." *Cal v. Garnett*, 991 F.3d 843, 850 (7th Cir. 2021); *see McQuiggin v. Perkins*, 569 U.S. 383, 392 (2013) ("We have not resolved whether a prisoner may be entitled to habeas relief based on a freestanding claim of actual innocence."); *Herrera*

---

[2] The petition styles these as ten claims, with Claims 8–9 treated as one. However, because each subclaim contains a separate "asserted . . . basis for relief from a state court's judgment of conviction," they are properly treated as separate claims. *See Gonzalez v. Crosby*, 545 U.S. 524, 530 (2005).

[3] Even if Claim 9 was cognizable on federal habeas review, it would be procedurally defaulted. Although Suggs raised this claim in his petition for rehearing before the Illinois Appellate Court and in his direct appeal PLA, he did not raise it in his initial brief before the Illinois Appellate Court. Thus, it did not receive one complete round of state-court review.

*v. Collins*, 506 U.S. 390, 417 (1993) (assuming for the sake of argument that a "truly persuasive demonstration of 'actual innocence' made after trial" in a capital case could create a constitutional claim, but finding that the petitioner had not shown actual innocence); *id.* at 427–28 (Scalia, J., concurring) ("There is no basis in text, tradition, or even in contemporary practice . . . for finding in the Constitution a right to demand judicial consideration of newly discovered evidence of innocence brought forward after conviction."). Because, as discussed below, both claims are clearly procedurally defaulted, the court need not decide whether they are cognizable.

## II.   Claims 1, 2, 3, 4, 5, 6, 8, 10, and 11 Are Procedurally Barred

That leaves ten remaining claims. Nine, however—all but Claim 7—are procedurally defaulted, and no exception to the procedural default rule allows the court to consider those claims.

### A.   Procedural Default

"There are two distinct ways in which a state prisoner can procedurally default a federal claim." *Thomas v. Williams*, 822 F.3d 378, 384 (7th Cir. 2016). The first derives from the independent and adequate state ground doctrine. *Id.*; *see Coleman v. Thompson*, 501 U.S. 722, 729–30 (1991). If "the state courts declined to address a petitioner's federal claims because the petitioner did not meet state procedural requirements," then the federal claim is procedurally defaulted, *Thomas*, 822 F.3d at 384, provided that "the state law ground . . . is *independent* of the federal question and *adequate* to support the judgment," *Lee v. Kemna*, 534 U.S. 362, 374 (2002) (emphasis in original) (quoting *Coleman*, 501 U.S. at 729). "[I]f the decision of the last state court to which the petitioner presented his federal claims fairly appeared to rest primarily on resolution of those claims, or to be interwoven with those claims," it is presumed that no independent and adequate state ground existed, unless the state court "clearly and expressly rel[ies]" on a state-law ground. *Coleman*, 501 U.S. at 735; *see Harris v. Reed*, 489 U.S. 255, 263 (1989).

The second derives from the requirement that a petitioner first "exhaust[] the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A); *see Thomas*, 822 F.3d at 384. "Ordinarily, a state prisoner satisfies this exhaustion requirement by raising his federal claim before the state courts in accordance with state procedures." *Shinn v. Ramirez*, 596 U.S. 366, 378 (2022). The petitioner must "fairly present" each claim to the state courts, which requires asserting the claim "throughout at least one complete round of state-court review." *Richardson v. Lemke*, 745 F.3d 258, 268 (7th Cir. 2014). However, "state-court remedies are . . . 'exhausted' whenever they are no longer available, regardless of the reason for their unavailability." *Woodford v. Ngo*, 548 U.S. 81, 92–93 (2006). Thus, a claim is also considered exhausted if it is now clearly procedurally barred under state law. *Gray v. Netherland*, 518 U.S. 152, 161–62 (1996). But to avoid "allow[ing] a state prisoner to simply ignore state procedure on the way to federal court," *Ramirez*, 596 U.S.

at 378, such claims, though "technically exhausted," are treated as procedurally defaulted. *Ngo*, 548 U.S. at 93. In such circumstances, procedural default is "an important 'corollary' to the exhaustion requirement." *Davila v. Davis*, 582 U.S. 521, 527 (2017).

### 1. An Adequate and Independent State Ground Supports the State Courts' Denial of Claim 6

Suggs pressed Claim 6—his *Gerstein/McLaughlin* claim—in both his direct appeal to the Illinois Appellate Court, [20-2] at 29–49, and his post-conviction petition, *see* [20-21] at 688 (discussing this claim). In determining whether the state court's judgment rested on a state procedural ground, the focus is on "the last *explained* state-court judgment." *Ylst v. Nunnemaker*, 501 U.S. 797, 805 (1991) (emphasis in original). The post-conviction trial court denied the claim on res judicata grounds, [20-21] at 688, indicating merely "that the state courts have already resolved the matter and want nothing more to do with it." *Moore v. Bryant*, 295 F.3d 771, 776 n.1 (7th Cir. 2002) (quoting *Porter v. Gramley*, 112 F.3d 1308, 1316 (7th Cir. 1997)). And under *Ylst*, "state rules against . . . superfluous recourse have no bearing upon [a petitioner's] ability to raise [his] claim[s] in federal court." 501 U.S. at 805. Thus, the relevant state-court decision is the Illinois Appellate Court's decision on Suggs's direct appeal. *See id.* at 805–06; *Guillory v. Allen*, 38 F.4th 849, 855–56 (9th Cir. 2022).

That court rejected the claim because Suggs did not properly preserve it for appellate review. [20-1] ¶ 60. It noted that, though Suggs filed a motion to suppress, his "specific objections did not involve the ground . . . raise[d] on appeal," and that "a specific objection waives all unspecified grounds for objecting." *Id.* (citing *People v. Shaw*, 2016 IL App (4th) 150444, ¶ 63). "[T]he Illinois waiver rule is an adequate state law ground for a judgment." *Richardson*, 745 F.3d at 271. The Illinois Appellate Court clearly and expressly invoked it. *See Gray v. Hardy*, 598 F.3d 324, 329 (7th Cir. 2010) (finding a clear and express invocation in a comparable state-court opinion). And the analysis was independent of federal law; though the Appellate Court conducted a plain-error review, [20-1] ¶¶ 61–89, that does not remove the waiver rule's status as an independent and adequate state ground. *See Miranda v. Leibach*, 394 F.3d 984, 992 (7th Cir. 2005). Thus, Claim 6 is procedurally defaulted.[4]

---

[4] In the alternative, Claim 6 is also procedurally defaulted because it was not included in either of Suggs's PLAs to the Illinois Supreme Court, which is required to fairly present a federal claim. *See Snow v. Pfister*, 880 F.3d 857, 864 (7th Cir. 2018). Although he did argue that his confession should be suppressed, he pressed that argument only under *Miranda v. Arizona*, 384 U.S. 436 (1966), and Illinois law—the arguments labeled Claims 8 and 9 in this opinion. Thus, while he may have "put forward [the] operative facts," he did not put forward the "controlling legal principles" that governed Claim 6. *See Nichols v. Wiersma*, 108 F.4th 545, 560 (7th Cir. 2024).

### 2. Claims 1, 2, 3, 4, 5, 8, 10, and 11 Were Never Fairly Presented to the State Courts

Claims 1, 2, 3, 4, 5, 8, 10, and 11 are each also procedurally defaulted because they were not fairly presented to the Illinois courts.

First, none of these claims were fairly presented to the state courts during Suggs's direct appeal. Although he presented several of these claims in his petition for rehearing and in his direct appeal PLA, that is "too late to preserve the claim[s]." *Meyers v. Gomez*, 50 F.4th 628, 648 (7th Cir. 2022). "Both the United States Supreme Court and [the Seventh Circuit] have held that an appellant does not fully and fairly present a federal claim to the state courts when he raises that claim for the first time in a petition for rehearing before the state appellate court or in a petition asking the state supreme court to grant him leave to appeal." *Lewis v. Sternes*, 390 F.3d 1019, 1031 (7th Cir. 2004). And the only claims Suggs raised before the Illinois Appellate Court were Claim 6 and the claim (not presented here) regarding the public-defender fee. Although Claim 6, like Claim 8, involves his motion to suppress, it relies on the Fourth Amendment under *Gerstein* and *McLaughlin*, not the Fifth Amendment under *Miranda*. Thus, raising Claim 6 was not sufficient to put forward the "controlling legal principles" governing Claim 8. *See Nichols v. Wiersma*, 108 F.4th 545, 560 (7th Cir. 2024).

Next, none of these claims was fairly presented to the state courts during Suggs's post-conviction proceedings. Although several were raised in his post-conviction petition, only Claim 7 was raised in his post-conviction appeal and PLA. The other claims in his post-conviction petition were not presented to the Illinois Appellate Court or the Illinois Supreme Court and thus did not receive "one complete round of the State's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). Thus, only Claim 7 was fairly presented to the state courts during Suggs's post-conviction proceedings.

### B. Cause and Prejudice

"To overcome procedural default, the prisoner must demonstrate 'cause' to excuse the procedural defect and 'actual prejudice'" if the federal court were to decline to hear his claim." *Ramirez*, 496 U.S. at 371 (quoting *Coleman*, 501 U.S. at 750). "To establish cause, the prisoner must 'show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule.'" *Id.* at 379 (quoting *Murray v. Carrier*, 477 U.S. 478, 488 (1986)). To establish prejudice, "the prisoner must show not merely a substantial federal claim, such that 'the errors at . . . trial created a *possibility* of prejudice,' but rather that the constitutional violation 'worked to his *actual* and substantial disadvantage.'" *Id.* (alterations in original) (quoting *Carrier*, 477 U.S. at 494).

Suggs's petition does not raise any cause-and-prejudice arguments, and he did not file a reply brief responding to the warden's procedural default arguments. The closest he comes is his contention that he received ineffective assistance of counsel. But where, as here, the ineffective assistance a petitioner seeks to use to excuse a procedural default "is itself an independent constitutional claim," it must first be fairly presented to the state courts. *Edwards v. Carpenter*, 529 U.S. 446, 451–52 (2000).[5] As discussed above, Suggs did not fairly present an ineffective assistance of counsel claim to the state courts. To be sure, the absence or ineffectiveness of post-conviction counsel can sometimes allow a federal court to review claims that, like Claim 1, allege ineffective assistance of trial counsel. *See Martinez v. Ryan*, 566 U.S. 1, 17 (2012). But that path is available only where the "state procedural framework . . . makes it highly unlikely in a typical case that a defendant will have a meaningful opportunity to raise a claim of ineffective assistance of trial counsel on direct appeal." *Trevino v. Thaler*, 569 U.S. 413, 429 (2013). That is not the case in Illinois. *Crutchfield v. Dennison*, 910 F.3d 968, 971 (7th Cir. 2018). Thus, Suggs cannot show cause for and prejudice from his procedural default.

## C.  Actual Innocence

Alternatively, a court may excuse a procedural default where failure to consider a claim would result in a "fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750. "To demonstrate a fundamental miscarriage of justice, a petitioner must show that 'a constitutional violation has probably resulted in the conviction of one who is actually innocent' such that 'it is more likely than not that no reasonable juror would have convicted [the petitioner] in the light of the new evidence.'" *Thomas v. Williams*, 822 F.3d 378, 386 (7th Cir. 2016) (alteration in original) (quoting *Schlup v. Delo*, 513 U.S. 298, 327 (1995)). This "standard is a demanding one that 'permits review only in the "extraordinary" case.'" *Coleman v. Lemke*, 739 F.3d 342, 349 (7th Cir. 2014) (quoting *House*, 547 U.S. at 538).

In Claim 10, Suggs does claim that he is actually innocent (though he does not specify of which crime). Although he raises that argument "as a substantive matter" rather than "as a gateway . . . through which [he] might pass," *Dixon v. Williams*, 93 F.4th 394, 402–03 (7th Cir. 2024) (distinguishing these "two kinds of actual innocence claims"), the court will also consider it as a potential gateway through procedural default. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007) ("A document filed

---

[5] Ineffective assistance will almost always be such an independent constitutional claim, since generally "[n]ot just any deficiency in counsel's performance" supplies cause for a procedural default, but only assistance that was "so ineffective as to violate the Federal Constitution." *Carpenter*, 529 U.S. at 451. The Supreme Court has recognized one "narrow exception" to that rule, *see Martinez v. Ryan*, 566 U.S. 1, 9 (2012), but it is not applicable here. *See Davila*, 582 U.S. at 530 (holding that the *Martinez* exception "applies only to claims of 'ineffective assistance of counsel at trial'").

*pro se* is 'to be liberally construed.'" (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)).

An assertion of actual innocence must be supported by "new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup*, 513 U.S. at 324. The "new evidence" need not be "newly discovered." *Gladney v. Pollard*, 799 F.3d 889, 898 (7th Cir. 2015), but must be "reliable" and "not presented at trial." *Gomez v. Jaimet*, 350 F.3d 673, 679 (7th Cir. 2003). "[A]dequate evidence is 'documentary, biological (DNA), or other powerful evidence: perhaps some non-relative who placed [petitioner] out of the city, with credit card slips, photographs, and phone logs to back up the claim.'" *McDowell v. Lemke*, 737 F.3d 476, 483 (7th Cir. 2013) (quoting *Hayes v. Battaglia*, 403 F.3d 935, 938 (7th Cir. 2005)).

Attempting to meet this burden, Suggs contends that Detective Schletz punched him in the stomach three times after he refused to confess to the Check 'n Go murder—an allegation Suggs has not made until now because he feared Schletz would harm his family. [1] at 13. While he has not provided evidence in support of this allegation, he notes that an affidavit is "available upon request." *Id.* Even if Suggs provided such an affidavit, however, it would not meet his high burden. "Such 'eleventh hour' affidavits, containing facts not alleged at trial and accompanied by no reasonable explanation for the delay are inherently suspect," and cannot excuse a procedural default. *McDowell*, 737 F.3d at 484. Moreover, even if the allegation is taken as true, it does not demonstrate innocence; "[i]t can, of course, simultaneously be true that [Schletz] was abusive . . . and that [Suggs] committed the crime." *Dixon*, 93 F.4th at 405; *cf. Whitlock v. Brueggemann*, 682 F.3d 567, 585 (7th Cir. 2012) ("Evidence collected with these kinds of suspect techniques . . . may turn out to be true."). A reasonable juror—even one who believed Suggs's confession was coerced—could nevertheless have voted to convict, perhaps relying on the fact that the gun discovered at the Ma & Pa store was the same one used in the Check 'n Go murder.

Suggs has not cleared the high bar of showing that actual innocence excuses his procedural defaults.

## III. Claim 7 is Barred by Section 2254(d)'s Limitation on Relief

That leaves only Claim 7, Suggs's Eighth Amendment challenge to his sentence. The last reasoned decision on that claim was the Illinois Appellate Court's decision on Suggs's post-conviction appeal, which denied the claim on the merits. [20-12].[6] "[I]n reviewing the work of their peers, federal judges must begin with the 'presumption that state courts know and follow the law.'" *Dunn v. Reeves*, 594 U.S. 731, 739 (2021) (quoting *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002)). Unless a

---

[6] The Illinois Supreme Court's decision to deny the post-conviction PLA does not qualify because it is really "a decision . . . not to decide at all." *Greene v. Fisher*, 565 U.S. 34, 40 (2011).

statutorily-enumerated exception pierces that presumption, a state-court merits adjudication of a claim bars federal habeas relief on that claim. *See* 28 U.S.C. § 2254(d). A federal habeas court may grant relief only if the state-court adjudication (1) "resulted in a decision that was contrary to . . . clearly established Federal law," 28 U.S.C. § 2254(d)(1); (2) "involved an unreasonable application of[] clearly established Federal law," *id.*; or (3) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," *id.* § 2254(d)(2).

Clearly established law must be "determined by the Supreme Court of the United States." *Id.* § 2254(d)(1). "It is not enough that the state-court decision offends lower federal court precedents." *Brown v. Davenport*, 596 U.S. 118, 136 (2022). Only "the holdings, as opposed to the dicta," of Supreme Court decisions constitute clearly established law. *Williams v. Taylor*, 529 U.S. 362, 412 (2000). And only the precedents that existed when the state court made its decision—in this case, March 17, 2020—contribute to the body of clearly established law. *Greene v. Fisher*, 565 U.S. 34, 38 (2011).

"A state-court decision is 'contrary to' clearly established federal law if the state court 'applie[d] a rule different from the governing law set forth' in Supreme Court decisions or decided a case differently than the Supreme Court 'on a set of materially indistinguishable facts.'" *Corral v. Foster*, 4 F.4th 576, 582 (7th Cir. 2021) (alteration in original) (quoting *Bell v. Cone*, 535 U.S. 685, 694 (2002)).

"Deciding whether a state court's decision 'involved' an unreasonable application of federal law or 'was based on' an unreasonable determination of fact requires the federal habeas court to 'train its attention on the particular reasons—both legal and factual—why state courts rejected a state prisoner's federal claims,' and to give appropriate deference to that decision." *Wilson v. Sellers*, 584 U.S. 122, 125 (2018) (quoting *Hittson v. Chatman*, 135 S. Ct. 2126, 2126 (2015) (Ginsburg, J., concurring in denial of certiorari)). "[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Harrington v. Richter*, 562 U.S. 86, 102 (2011). Rather, an application of federal law is unreasonable only if "there is no possibility fairminded jurists could disagree that the state court's decision conflicts with" clearly established law. *Id.* In making this determination, the federal court "is limited to the record that was before the state court." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

Similarly, "a state court's decision is factually unreasonable only when it 'rests upon fact-finding that ignores the clear and convincing weight of the evidence,'" *McManus v. Neal*, 779 F.3d 634, 649 (7th Cir. 2015) (quoting *Goud v. Basinger*, 604 F.3d 394, 399 (7th Cir. 2010)). "The decision must be 'so inadequately supported by the record as to be arbitrary and therefore objectively unreasonable.'" *Alston v. Smith*, 840 F.3d 363, 370 (7th Cir. 2016) (quoting *Ward v. Sternes*, 334 F.3d 696, 704 (7th Cir. 2008)). Like the "unreasonable application" determination, this

determination must be based only on "the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).

Here, the relevant clearly established law consists of a trio of cases involving juvenile sentencing: *Roper v. Simmons*, 543 U.S. 551, 568 (2005) (barring the death penalty for juvenile offenders), *Graham v. Florida*, 560 U.S. 48, 74–75 (2010) (barring life-without-parole sentences for juvenile offenders convicted of non-homicide offenses), and—most significantly—*Miller v. Alabama*, 567 U.S. 460 (2012), which barred mandatory life-without-parole (LWOP) sentences for juvenile offenders. *Id.* at 465. None of these cases is directly applicable to Suggs. For one, he received a 110-year sentence, not the death penalty (as in *Roper*) or LWOP (as in *Graham* and *Miller*). That did not prevent the Illinois Appellate Court from considering his claim, however, as the Illinois courts apply *Miller* to "mandatory [terms] of years that [are] the functional equivalent of life without the possibility of parole." *People v. Reyes*, 2016 IL 119271, ¶ 9.

Instead, the Illinois Appellate Court rejected Suggs's claim on a different basis: his age (23) at the time of the offense. *Roper*, *Graham*, and *Miller* each involved defendants under the age of eighteen. *Roper*, 543 U.S. at 568; *Graham*, 560 U.S. at 74–75; *Miller*, 567 U.S. at 465. While the state court noted the "support for extending the treatment of juveniles to young adults because neurological development seems to continue into the mid-twenties," it also observed that no court had extended these cases "to a 21-year-old, let alone someone older than that." [20-12] ¶ 37.

This court cannot conclude that the Illinois Appellate Court's decision involved an unreasonable application of *Roper*, *Graham*, and *Miller*. Some have indeed argued for extending these cases beyond the age of eighteen. *See, e.g.*, *Ruiz v. United States*, 990 F.3d 1025, 1039–40 (7th Cir. 2021) (Wood, J., dissenting). But doing so would be an extension—not an application—of *Roper*, *Graham*, and *Miller*, "all of which drew the line at eighteen." *In re Rosado*, 7 F.4th 152, 159 (3d Cir. 2021); *see also United States v. Sierra*, 933 F.3d 95, 97 (2d Cir. 2019); *United States v. Marshall*, 736 F.3d 492, 498–99 (6th Cir. 2013). *Roper* itself addressed the objection that "[t]he qualities that distinguish juveniles from adults do not disappear when an individual turns 18." 543 U.S. at 574. It responded simply that "a line must be drawn," and that "society draws the line . . . between childhood and adulthood" at eighteen. *Id.* Because an extension of *Roper*, *Graham*, and *Miller* to 23-year-old defendants would be just that—an extension—the Illinois Appellate Court's refusal does not remove Section 2254(d)'s barrier to relief. *See White v. Woodall*, 572 U.S. 415, 426 (2014) (holding that Section 2254(d) "does not require state courts to *extend* . . . precedent or license federal courts to treat the failure to do so as error" (emphasis in original)).

Claim 7 is therefore barred by Section 2254(d).

## IV.     Certificate of Appealability

"A certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Because Claims 1, 2, 3, 4, 5, 6, 8, 10, and 11 were dismissed on procedural grounds, a certificate of appealability as to those claims "should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that reasonable jurists would find it debatable whether the district court was correct in its procedural ruling." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). "Where a plain procedural bar is present and the district court is correct to invoke it to dispose of the case, a reasonable jurist could not conclude either that the district court erred in dismissing the petition or that the petitioner should be allowed to proceed further." *Id.* Because these claims are clearly procedurally defaulted, the court declines to issue a certificate of appealability as to them.

As for Claim 7, which is barred by Section 2254(d), the question is whether the application of Section 2254(d) "was debatable among jurists of reason." *Miller-El v. Cockrell*, 537 U.S. 322, 341 (2003). The court concludes that it was not and thus declines to issue a certificate of appealability.

## V.     Notice of Appeal Rights

This is a final decision ending this case in this court. If petitioner wishes to appeal, he must file a notice of appeal in this court within thirty days of the entry of judgment. *See* Fed. R. App. P. 4(a)(1). He need not bring a motion to reconsider this court's ruling to preserve his appellate rights. However, if he wishes the court to reconsider its judgment, he may file a motion under Federal Rule of Civil Procedure 59(e) or 60(b). A Rule 59(e) motion must be filed within 28 days of the entry of judgment. *See* Fed. R. Civ. P. 59(e). A timely Rule 59(e) motion suspends the deadline for filing an appeal until the Rule 59(e) motion is ruled upon. *See* Fed. R. App. P. 4(a)(4)(A)(iv). A Rule 60(b) motion must be filed within a reasonable time and, if seeking relief under Rule 60(b)(1), (2), or (3), must be filed no more than one year after entry of the judgment or order. *See* Fed. R. Civ. P. 60(c)(1). A Rule 60(b) motion suspends the deadline for filing an appeal until the Rule 60(b) motion is ruled upon only if the motion is filed within 28 days of the entry of judgment. *See* Fed. R. App. P. 4(a)(4)(A)(vi). The time to file a motion pursuant to Rule 59(e) or Rule 60(b) cannot be extended. *See* Fed. R. Civ. P. 6(b)(2).

## CONCLUSION

The petition [1] is denied, and the court declines to issue a certificate of appealability. Enter final judgment. Civil case terminated.

Dated: August 26, 2025                               /s/ Martha M. Pacold